**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 10-35-DLB**

**PERFETTI VAN MELLE USA, ET AL.**                                        **PLAINTIFFS**

**vs.**                        **MEMORANDUM OPINION & ORDER**

**CADBURY ADAMS USA LLC**                                        **DEFENDANT**

\*    \*    \*    \*    \*    \*    \*

Plaintiffs, owners of the registered trademarks "Mentos Pure Fresh" and "Pure White" for chewing gum, commenced the instant action after learning of Defendant's intention to market a competing gum under the name "Dentyne Pure."  Plaintiffs assert causes of action for trademark infringement, false description, and false designation of origin under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), as well as trademark infringement and unfair competition under Kentucky law, Ky. Rev. Stat. §§ 365.100, 365.110, 365.601(2), and seek a variety of relief including preliminary and permanent injunctions, disgorgement of profits, compensatory and punitive damages, attorneys' fees and costs.

This matter is currently before the Court on Plaintiffs' Motion for Preliminary Injunction. (Doc. #9).  The motion has been fully briefed (Docs. #20, 29, 49), and the Court heard two days of testimony on the issues involved; Plaintiffs' motion is therefore ripe for adjudication.  For the reasons set forth below, because Plaintiffs have not shown that

1

consumers are likely to be confused as to the source of the parties' competing chewing gum products, Plaintiffs' Motion for Preliminary Injunction (Doc. #9) is **denied**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The following recitation of the facts–which the Court has gleaned from the parties' written submissions, evidence in the record, and testimony elicited during the June 22 and 23, 2010 preliminary injunction hearing–is set forth for the limited purpose of adjudicating Plaintiffs' Motion for Preliminary Injunction.

Plaintiffs Perfetti Van Melle USA and Perfetti Van Melle Benelux B.V. (hereinafter referred to collectively as "Perfetti") are wholly-owned affiliates of Perfetti Van Melle S.p.A., an international confectionery company that produces and markets candy and gum products worldwide under several well-known brand names, including Mentos, Airheads, Chupa Chups, and Smint.  Since October 2008, Perfetti has manufactured and distributed chewing gum products in the United States under the name "Mentos Pure Fresh." Currently offered in three flavors–Fresh Mint, Wintergreen, and Spearmint–"Mentos Pure Fresh" gums offer consumers a chewing experience with a high degree of "freshness", both in terms of the gum's flavor as well as its ability to freshen bad breath.  In 2009, Perfetti expanded its "Mentos Pure" line of gums to include "Mentos Pure White," a mint-flavored gum with tooth-whitening properties.

Both types of "Mentos Pure" gum are sold as a circular pellet with a liquid center, and are packaged in an oval-shaped plastic vial–referred to by Perfetti as a "plastic 'pocket' bottle"–that is covered with a label bearing the word "Mentos" in large royal blue

lower-case letters across the length of the bottle.  Displayed in slightly-smaller capital letters just below the brand name "Mentos" is the type of gum–"Mentos Pure Fresh" or "Mentos Pure White"–contained in the bottle, and a corresponding tag line, either "Pure Breath" or "Whitens Teeth."  The color of each bottle and its label varies depending on the type and flavor of gum contained within.  Bottles of "Mentos Pure Fresh" gum are covered in a sparkling, holographic label in varying shades of blue and green–light blue for Fresh Mint, forest green for Spearmint, and turquoise for Wintergreen–while "Mentos Pure White" comes in an opaque white bottle covered in a clear label with silver accents.  Each bottle of "Mentos Pure" gum bears a depiction of a piece of piece of Mentos gum in cross section. Images of the four varieties of "Mentos Pure" gum are reproduced below.



Defendant Cadbury Adams USA LLC ("Cadbury") is a subsidiary of Cadbury plc, a leading worldwide manufacturer and marketer of chewing gum, mints, and chocolate. Cadbury's widely-recognized chewing gum brands include Dentyne, Trident, Stride, Chiclets, and Bubblicious.[1]  In September 2009, Cadbury announced to its retail and distributor customers its creation of "Dentyne Pure," a mint gum containing proprietary ingredients which neutralize bad breath odors caused by bacteria and food.  Cadbury began accepting orders for "Dentyne Pure" in February 2010; the product is currently distributed to and sold by retailers nationwide.

"Dentyne Pure" is sold in two flavors–Mint with Herbal Accents and Mint with Melon Accents–each as a white rectangular pellet packaged in a flat, foil-sealed plastic blister pack that sits within a rectangular cardboard sleeve.  The word "Dentyne" is prominently presented in white stylized script across the top fourth of the sleeve.   Immediately underneath is the word "pure," which appears in large lower-case letters above the tag line "Purifies Your Breath."  Each flavor of "Dentyne Pure" has a corresponding color scheme: packages of Mint with Herbal Accents sport a medium blue background with white and purple lettering and embellishments, while packages of Mint with Melon Accents are predominantly lime green with white and yellow text and designs.  On the bottom-right corner of each package of "Dentyne Pure" is the image of a curved mint leaf dotted with droplets of water.  Images of the two varieties of "Dentyne Pure" appear below.

---

[1] On February 2, 2010, Kraft Foods, Inc. acquired Cadbury plc.

4

 

After learning of Cadbury's intent to introduce "Dentyne Pure" into the national marketplace, Perfetti filed the instant action, seeking relief under the Lanham Act and Kentucky state law.  (Doc. #1).  Perfetti alleges that, by introducing a new sub-brand of Dentyne chewing gum that contains the term "pure," Cadbury intentionally copied Perfetti's registered trademarks for "Mentos Pure Fresh" and "Pure White," and that a likelihood of consumer confusion as to the source or origin of the parties' products will result.  On March 5, 2010, Perfetti filed a Motion for Preliminary Injunction seeking to enjoin Cadbury from continuing to use the allegedly infringing mark "Dentyne Pure."  (Doc. #9).

## II. ANALYSIS

When considering a motion for preliminary injunctive relief, the Court must balance four factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Tumblebus, Inc. V. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (quoting *PACCAR Inc. v.*

*TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)).  The individual factors are not prerequisites that must be met, but rather they are considerations to be balanced by the Court in its equitable capacity to grant the preliminary injunction.  *See United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004); *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1263 (6th Cir. 1985) (The preliminary injunction factors "do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunction relief").  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).  The Court will address each factor in turn.

## A.      Likelihood of Success on the Merits

To prevail on its trademark infringement, false designation of origin, and unfair competition claims, Perfetti must prove that it owns the registered trademarks "Mentos Pure Fresh" and "Pure White," and that Cadbury's use of "Dentyne Pure" is likely to confuse consumers as to the source or sponsorship of the parties' products.[2]  *Hensley Mfg. v. Propride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (To succeed on a claim of trademark infringement under the Lanham Act a plaintiff must establish "(1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion").  Because Perfetti has established that it owns the registered trademarks

---

[2] Although Plaintiffs assert four separate claims in their Complaint–two under the Lanham Act and two under Kentucky state law–all employ the same "likelihood of confusion" test.  *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (Under the Lanham Act, the Sixth Circuit Court of Appeals uses "the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks" (citing *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992))); *Kay Jewelry Co. v. Gay's Jewelry, Inc.*, 277 S.W.2d 30, 33 (Ky. 1955) ("The rule as to unfair competition . . . is that the name used by the defendant when not the same as that of the plaintiff must be so similar thereto that under all the circumstances . . . its use in itself is reasonably calculated to deceive the public . . . ."); *Colston Inv. Co. v. Home Supply Co.*, 74 S.W.3d 759, 766 (Ky. Ct. App. 2001) ("The test of infringement is the likelihood of confusion . . . .").

"Mentos Pure Fresh" and "Pure White," only the third requirement–likelihood of confusion–is at issue in this case.[3]

### 1.    Likelihood of Confusion

The "touchstone of liability" in a trademark infringement action is "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the *origin* of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) (emphasis added).  To determine whether a likelihood of confusion exists, the Court must analyze and balance the following eight factors: (1) strength of the plaintiff's mark; (2) similarity of the marks; (3) relatedness of the goods; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792-93 (6th Cir. 2004). The Sixth Circuit has cautioned that these factors "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991).   Each trademark infringement case presents a unique set of factual circumstances; consequently, not all of the eight factors will be relevant in every case.  *Id.* However, in every trademark infringement action, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  *Id.*

---

[3] During the evidentiary hearing, Perfetti entered the federal trademark registrations for "Mentos Pure Fresh" (U.S. Registration No. 3,616,865) and "Pure White" (U.S. Registration No. 3,804,538) into the record. (Pls' Exs. #1, 78).

### a.   Strength of Perfetti's Marks

"The strength of a mark is a factual determination of the mark's distinctiveness." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280.  "A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Id.* The more distinct a mark, the greater the protection it is due, as "a strong mark is deemed more likely to produce confusion among buyers." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 516 (6th Cir. 2007).

Under the Lanham Act, marks fall into one of four categories, from strongest to weakest: (1) arbitrary and fanciful; (2) suggestive; (3) descriptive; and (4) generic.  *See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593 (6th Cir. 1989).  A mark's distinctiveness is premised upon the category into which it is placed. Fanciful or arbitrary marks are the most distinctive, and are distinguished by the conceptual distance between the trademarked word or phrase and the nature of the product represented by the mark.  *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987) ("A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned (*e.g.*, Exxon, Kodak).  An 'arbitrary' mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached (*e.g.*, Camel cigarettes or Apple computers).").  Suggestive and descriptive marks are considered weaker due to the relatively close correlation between the mark and the qualities of the product.  *Id.* ("'Suggestive' and 'descriptive' marks either evoke some quality of the product (*e.g.*, Easy Off, Skinvisible) or describe it directly (*e.g.*, Super Glue).").

8

The registered marks at issue in this case are composite marks consisting of several distinct visual and linguistic components.  The mark "Mentos Pure Fresh" combines the arbitrary term "Mentos" with the suggestive terms "pure" and "fresh", while the mark "Pure White" combines two suggestive terms.  As used by Perfetti in this context, the terms "pure," "fresh," and "white" are suggestive rather than descriptive because they call to mind the qualities or benefits of chewing Mentos gum–*i.e.*, unadulterated freshness and/or intense tooth-whitening power–instead of describing the appearance or purpose of the product.  Consequently, all four of the marks' component terms fall on the stronger end of the spectrum of distinctiveness.

Cadbury contends that the marks' inclusion of the commonly-use term "pure" weakens Perfetti's marks.  The Court disagrees.  Cadbury's argument, which requires breaking down Perfetti's marks into their individual components and assessing the strength of each component term in isolation, runs contrary to the established principle that "'the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace.'" *AutoZone, Inc.*, 373 F.3d at 795 (quoting *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993)).  In the marketplace, Perfetti's registered marks appear as "Mentos Pure Fresh" and "Mentos Pure White."[4]  Although the terms "pure," "fresh," and "white" are undoubtedly weaker than the arbitrary term "Mentos," the Court finds that the strong, nationally-recognized brand name "Mentos" is not appreciably weakened by its pairing with the phrases "pure fresh" or "pure

---

[4] Although the trademark registration for"Pure White" does not include the term "Mentos," at the evidentiary hearing, Perfetti indicated that it has not, and does not intend to, market chewing gum under the mark "Pure Fresh" without the well-known brand name "Mentos."

9

white".  *See AutoZone, Inc.*, 373 F.3d at 795 (holding that the weaker term "zone" did not

sap the strength of the "AutoZone" mark where there was no evidence of pervasive use of

the composite mark as a whole.).

Additionally, the strength of Perfetti's marks is increased by their high degree of

recognition in the national marketplace.  Not only are "Mentos Pure Fresh" and "Mentos

Pure White" chewing gums available nationwide, but Perfetti has expended considerable

resources to advertise these products to consumers, spending approximately $15 million

on advertising and $10 million on promotional activities such as coupons, shelf tags, and

store displays.  (Doc. #79 at 8).

The distinctive nature of the marks "Mentos Pure Fresh" and "Pure White" combined

with Perfetti's intensive nationwide advertising of its chewing gums renders the marks

reasonably strong and deserving of protection.  This factor therefor favors a finding of a

likelihood of confusion.  However, this finding has no impact on the Court's "analysis of the

similarity of the marks, the relatedness of the products and services, or any of the other

factors in the likelihood-of-confusion test."  *AutoZone, Inc.*, 373 F.3d at 795.

## b.    Similarity of the Parties' Marks

In general, "[s]imilarity of marks is a factor of considerable weight."  *Daddy's Junky*

*Music Stores, Inc.*, 109 F.3d at 283.  When assessing similarity, the Court should consider

the "pronunciation, appearance, and verbal translation of conflicting marks."  *Id.*  "A side-by-

side comparison of the litigated marks is not appropriate, although naturally the

commonalities of the respective marks must be the point of emphasis."  *AutoZone, Inc. v.*

*Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004).  Rather, the Court must determine

"whether a given mark would confuse the public when viewed alone, in order to account

10

for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283.

Perfetti urges the Court to assess the similarity of the parties' marks by focusing solely on the shared term "pure" and ignoring the brand names "Mentos" and "Dentyne." (Doc. #79 at 16) ("The parties' marks are highly similar because their dominant or salient part, PURE, is identical."). In support of its proposed approach, Perfetti submits the expert opinion of University of Louisville marketing professor Michael J. Barone, who testified that the brand element "pure" drives consumer perceptions of the parties' products. The Court finds neither Perfetti's arguments, nor Professor Barone's testimony, to be persuasive. First, examining only the shared element "pure" would run contrary to the well-established rule that courts must "view marks in their entirety and focus on their overall impression, not individual features." *AutoZone, Inc.*, 373 F.3d at 795. Indeed, the Sixth Circuit has cautioned that "a trademark 'should not be split up into its component parts and each part then compared with parts of the conflicting mark to determine the likelihood of confusion.'" *Little Caesar Enters., Inc.*, 834 F.2d at 571 (quoting Thomas McCarthy, Trademarks and Unfair Competition § 23:15 (2d 1984)). Second, even if Professor Barone's opinions regarding the positive effect of the "pure" sub-brand element upon consumer perceptions of the parties products are accurate, those opinions are of little utility to the Court. The fact that the same brand concepts or product qualities–purity of flavor and/or breath purification–may motivate consumers to purchase the parties' competing products has no bearing on whether the parties' marks are visually or linguistically similar, or whether consumers are likely to be confused as to the source of the parties' products.

11

Viewing the parties' marks in their entirety, the Court observes that the marks are linguistically and visually distinct.  When pronounced, they each have a different number of syllables, whose combination is not similar.  *See Little Caesar Enters., Inc.*, 834 F.2d at 572 ("The differences in sound and appearance between 'Little Caesar' and 'Pizza Caesar' are obvious, and the addition of the acronym 'USA' to the latter mark almost doubles the number of syllables and heightens the distinction.").  The various fonts used in each mark are different. Not only are the brand names "Mentos" and "Dentyne" presented in the same distinct fonts that appear on the brands' other well-known products (such as Mentos candy and other types of Dentyne chewing gum), but also the term "pure" is presented in a different manner by each mark.  For the Perfetti marks, the word "pure" appears in a plain, boxy font and in all capital letters.  In contrast, the Cadbury mark depicts the term in a lower-case letters and in a stylized, rounded font.

The visual elements of each mark are also dissimilar.  The color schemes of each mark are different, and vary depending on the flavor of the product represented.  The Perfetti marks contain eye-catching design elements—such holographic labeling and shiny silver accents—which are absent from Cadbury's mark.   In addition, the parties have chosen distinct visual representations of their products.  Each package of "Mentos Pure Fresh" or "Mentos Pure White" chewing gum contains a photographic image of a single pellet of Mentos gum in cross-section that displays the product's liquid center.  In contrast, packages of "Dentyne Pure" bear the image of a mint leaf scattered with droplets of water surrounded by a swirly, abstract design.

In light of the of the significant visual and linguistic differences between the marks, the Court finds that, although the marks share the term "pure," they are otherwise

12

significantly dissimilar such that the likelihood of confusion is minimal.  *AutoZone, Inc.*, 373 F.3d at 795-96 ("The AUTOZONE and POWERZONE marks have some visual and linguistic similarities, but ultimately their differences outnumber their similarities such that the likelihood of confusion is small.");  *Little Caesar Enters., Inc.*, 834 F.2d at 571-72 (finding the marks "Little Caesars" and "Pizza Caesar" to be dissimilar because of their differences in sound and appearance).

Furthermore, any small likelihood of consumer confusion that may exist is significantly decreased by the parties' prominent display of the widely-recognized brand names (our "house marks") "Mentos"or "Dentyne" on each of their competing products. "The use of a challenged junior mark together with a house mark or house tradename can distinguish the challenged junior mark from the senior mark and make confusion less likely."  *AutoZone, Inc*, 373 F.3d at 796 (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("[Defendant]'s prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused at to the source of the parties products.")).

During the evidentiary hearing, representatives from both parties testified that neither Perfetti nor Cadbury had, or intended to, market their "pure" chewing gums without the accompanying well-established "Mentos" and "Dentyne" brands names.  The inclusion of these brand names in the parties' marks ensures that any consumer who sees the parties' products—either singly, or in close proximity on the shelf of a retailer—will be immediately informed as to the producer of each product.  Consequently, the parties' consistent use and prominent display of their famous house marks serves to distinguish their competing products, and nearly eliminates any likelihood of consumer confusion as

13

to the source of the parties' chewing gums.  *See AutoZone, Inc.*, 373 F.3d at 797 ("[T]he use of the Radio Shack house mark in proximity to POWERZONE reduces the likelihood of confusion from any similarity that does exist.").  This factor, therefore, weighs heavily against a finding of likelihood of confusion.

### c.  Relatedness of the Parties' Goods

The relatedness of goods in a trademark infringement action is determined by assigning the dispute to a place within a "tripartite system."  *AutoZone, Inc.*, 373 F.3d at 798.  If the parties are in direct competition, "confusion is likely if the marks are sufficiently similar."  *Id.* at 797.  If the goods are "somewhat related, but not competitive," the likelihood of confusion will turn on one of the other seven factors.  *Id.*  If the products are unrelated, a likelihood of confusion is "highly unlikely."  *Id.*  "Services and goods are related not because they coexist in the same broad industry, but are related if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company."  *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283-84 (internal quotation marks omitted).

Perfetti and Cadbury produce the same product–mint-flavored chewing gum with breath-freshening properties–and enjoy national distribution.  Neither party disputes that "Mentos Pure Fresh" and "Dentyne Pure" chewing gums are directly competitive, being essentially identical in function and price, and being sold in close proximity to each other on retail shelves across the United States.  Despite the uncontested relatedness of the parties' goods, because the parties marks are dissimilar this factor does not weigh in favor of a finding of a likelihood of confusion.  *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,

14

502 F.3d 504, 516 (6th Cir. 2007) ("Because [plaintiff and defendant] do not possess similar marks, however, this factor weighs against a finding of a likelihood of confusion.").

### d.    Evidence of Actual Confusion

"Evidence of confusion is undoubtedly the best evidence of likelihood of confusion." *AutoZone, Inc.*, 373 F.3d at 798.  However, "a lack of such evidence is rarely significant, and the factor of actual confusion is weighted only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available."  *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284 (quotation omitted).  Perfetti has not presented any evidence of actual consumer confusion as to the source of the parties' products; therefore, this factor will have no effect on the Court's analysis.  *AutoZone, Inc.*, 373 F.3d at 799 ("Because AutoZone presented no evidence of actual confusion, this factor should not have any bearing on the analysis.").

### e.    Marketing Channels Used

This factor requires the Court to ask two questions: "(1) whether the parties use the same means to market the product, and (2) whether the 'predominant customers' are the same."  *Gen. Motors Corp. v. Keystone Auto Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006) (quoting *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 285).  In the instant case, the answer to both questions is affirmative.

Testimony from the parties corporate representatives establishes that both parties use the same methods to market their products—television, internet, and print advertising; in-store displays; and coupons.  The means used to market the parties' products are so similar that commercials for both "Mentos Pure Fresh" and "Dentyne Pure" have been run during the same prime time television shows.  Likewise, the parties sell their products to

15

the same customers: distributors and retailers who resell the parties' chewing gums to the general public.  For example, "Mentos Pure Fresh" is currently being sold in 95% of the 11,000 locations in which "Dentyne Pure" is also available for purchase.

Consequently, the Court finds that the parties use the same marketing channels. *See AutoZone, Inc.*, 373 F.3d at 793 ("As national retail outlets, both AutoZone and Radio Shack cater to the same general public and use the same marketing channels.").  This factor therefore weighs in favor of finding a likelihood of confusion.

### f.   Likely Degree of Purchaser Care

"This factor involves assessing (1) the type of goods at issue, and (2) the level of sophistication of the purchaser."  *Gen. Motors Corp.*, 453 F.3d at 357.  Courts typically use a "typical buyer exercising ordinary caution" standard when examining likely degree of purchaser care.  *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 285.  However, when the goods or services at issue are "expensive or unusual, the buyer can be expected to exercise greater care in her purchases," thereby lessening the likelihood of confusion. *Homeowners Group, Inc.*, 931 F.2d at 1111.  However, when the products involved are common and/or inexpensive, consumers may exhibit less care in their purchasing choices which may result in confusion.  *Procter & Gamble Co. v. Georgia-Pacific Consumer Prods. L.P.*, No. 1:09-cv-318, 2009 WL 2407764, at *8 (S.D. Ohio Aug. 3, 2009) ("[G]iven the relatively low cost of the products involved and the nature of the products, a typical buyer will spend only seconds making purchasing decision.  Some confusion may result in light of the apparent indifference of the average consumer to such purchases at the price point involved.").

The evidence currently before the Court indicates that the parties' products–chewing

16

gum–are inexpensive, low risk items that consumers tend to buy on impulse.  That consumers exhibit a low degree of care when purchasing chewing gum does weigh in favor of finding a likelihood of confusion; however, this finding is relatively insignificant in light of the significant dissimilarity of the parties' competing marks.  See *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286 ("The effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue."); *Little Caesar Enters., Inc.*, 834 F.2d at 572 ("[T]he district court thought it unlikely that the public would conduct must preprandial product research.  We agree, but note that it probably makes little difference on the facts before us.").

### g.   Cadbury's Intent in Selecting the Mark

Proving intent is not necessary to demonstrate likelihood of confusion, but "the presence of that factor strengthens the likelihood of confusion."  *AutoZone, Inc.*, 373 F.3d at 799 (citation omitted).  "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity."  *Homeowners Group, Inc.*, 931 F.2d at 1111.  A plaintiff need not present direct evidence to prove this factor: "[c]ircumstantial evidence of copying, particularly 'the use of a contested mark with knowledge of the protected mark at issue, 'is sufficient to support an inference of intentional infringement where direct evidence is not available.'"  *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 638-39 (6th Cir. 2002)(quoting *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286).

Perfetti contends that the record is replete with sufficient circumstantial evidence to support a finding that Cadbury intentionally copied Perfetti's "Mentos Pure Fresh" and "Pure White" marks.  Specifically, Perfetti asserts that Cadbury "likely knew of Perfetti's PURE

17

gum through 'normal competitive intelligence,'" and that the record contains evidence which establishes that "in August 2007 Cadbury's *Global* Gum Team studied the potential use of "PURE" to designate a new line of chewing gum."  (Doc. #79 at 4).  In addition, Perfetti notes that even if Cadbury was unaware of Perfetti's marks in 2007, there was "no doubt" that Cadbury learned of the existence of "Mentos Pure Fresh" and "Pure White" when its in-house trademark attorney conducted a search of United States Patent and Trademark Office records prior to seeking federal registration for "Dentyne Pure."  *Id.*

The Court finds this circumstantial evidence insufficient to support an inference that Cadbury intentionally copied Perfetti's marks.  At best, the evidence indicates that Cadbury was aware of the existence of Perfetti's "Mentos Pure Fresh" chewing gum (which was available in Europe beginning since 2006) and decided to create a directly competitive product.  Cadbury's development of a new product under its well-known house brand "Dentyne" that would compete with Perfetti for those consumers interested in purchasing mint-flavored chewing gum with breath purification properties does not–as Perfetti strenuously contends–evince an intent to cause confusion or to usurp the goodwill and reputation of Perfetti and/or the "Mentos" brand.  Although copying a trademark is illegal, competition is not.  *See State Farm Mut. Auto. Ins. Co. v. Sharon Woods Collision Ctr.*, No. 1:07-cv-457, 2007 WL 4207158, at *5 (S.D. Ohio Nov. 26, 2007) ("The purpose of the Lanham Act is to prevent customer confusion, not to prevent competition.")

Furthermore, the fact that a routine trademark search would have alerted Cadbury to the existence of Perfetti's products fails to bolster Perfetti's argument as mere knowledge of a competitive product does not support an inference of intentional copying.  *Therma-Scan, Inc.*, 295 F.3d at 639 ("The existence of a registered trademark prior to [defendant's]

18

adoption of its mark, moreover, does not support an inference that intentional copying occurred."); *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286-87 ("Plaintiff is incorrect to the extent that it is suggesting that the mere prior existence of a registered mark demonstrates that the alleged infringer intentionally copied that mark; otherwise, presumably all trademark infringement cases could result in a finding of intentional copying.").

The strongest evidence against a finding that Cadbury intentionally copied Perfetti's marks is the marks themselves.  Cadbury's decision to conspicuously emblazon its product with the widely-recognized brand name "Dentyne" belies any inference that it adopted the "Dentyne Pure" mark with the intention of profiting from the goodwill and public name recognition of "Mentos."  *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1047 (2d Cir. 1992) ("The prominent placement of the "Tylenol" name goes far toward countering any suggestion that McNeil intended to confuse its customers as to the source of its product.").  Consequently, the Court finds that there is no evidence in the record which could support an inference of intentional copying, and this factor lends no weight to the Court's analysis.  *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 287 ("As noted, the *presence* of intent can constitute strong evidence of confusion.  The converse of the proposition, however, is not true: the *lack* of intent by a defendant is 'largely irrelevant in determining if consumers likely will be confused as to source.'" (citation omitted)).

### h.    Likelihood of Expansion of the Product Lines

As a trademark owner is entitled to greater protection against products and services that are directly competitive or are marketed in the same geographic area, a "strong

possibility" that either party will expand into the product category or geographic area of the other and thereby target the same consumers increases the likelihood of confusion. *Homeowners Group, Inc.*, 931 F.2d at 1112; *Gen. Motors Corp.*, 453 F.3d at 358 ("Expansion could be geographic or an increase in products or services."). The Sixth Circuit "has explained that although evidence that either party will likely expand its product lines supports finding a likelihood of confusion, '[a] finding that the parties will not expand their marks significantly . . . does not address the ultimate issue of likelihood of confusion." *Therma-Scan, Inc.*, 295 F.3d at 639 (quoting *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 287).

The Court has already determined–and the parties do not dispute–that the parties' products are directly competitive. Indeed, there is little room for expansion: "Mentos Pure Fresh" and "Dentyne Pure" are similar products that are currently being sold in close proximity to each other by retailers nationwide. Therefore, this factor has no effect on the Court's likelihood-of-confusion analysis. *Victoria's Secret Stores v. Artco Equipment, Inc.*, 194 F. Supp. 2d 704, 728 (S.D. Ohio 2002) ("The parties already directly compete in selling lingerie over the Internet. Therefore, the Court finds the issue of expansion into competition product lines irrelevant to this analysis.").

### i.   Conclusion

In sum, although a number of the likelihood-of-confusion factors may favor Perfetti (strength of the mark, marketing channels used, and likely degree of purchaser care), the Court nonetheless holds that, due to the striking dissimilarity of the parties' marks, consumers are unlikely to be confused as to the source of the parties' products. In light of the fact that each party's chewing gum is prominently marked with a nationally-known,

origin-indicating brand name, the factors that favor Perfetti are "not enough to tip the balance." *See AutoZone, Inc.*, 373 F.3d at 801.  In considering the touchstone question of whether consumers are "likely to believe that the products or services offered by the parties are affiliated in some way," *Homeowners Group, Inc.*, 931 F.2d at 1107, the Court finds that Perfetti is unlikely to prevail on the merits of its claims as it has failed to present sufficient evidence that, when presented with Cadbury's product "Dentyne Pure," consumers are likely to think that product is affiliated in some way with Perfetti's "Mentos Pure Fresh" and "Mentos Pure White" chewing gums.

## B.   Irreparable Harm

"In general, a party seeking an injunction must show that absent the injunctive relief, he would suffer irreparable harm."  *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 608 (6th Cir. 1991).  Ordinarily, "irreparable injury . . . follows when a likelihood of confusion or possible risk to reputation appears from infringement or unfair competition."  *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999).

Perfetti contends that it is currently suffering irreparable harm because the existence of Cadbury's "Dentyne Pure" chewing gum "dilute[s] the uniqueness of Perfetti's PURE mark, eroding the importance of the brand to consumers (*i.e.*, goodwill), and ultimately, its sales."  (Doc. #79 at 22).  Specifically, Perfetti alleges that there is evidence that such "brand erosion" is already occurring: "[s]ince entry of the Dentyne PURE gum at Wal-Mart, Perfetti's PURE gum sales have suffered a steady (but steep) decline."  *Id.*

Perfetti's assertion that Cadbury's launch of "Dentyne Pure" has adversely affected the sales of "Mentos Pure Fresh" and "Mentos Pure White," however, is not supported by the evidence in the record.  Sales data collected by third-party reporting agencies and

submitted to the Court during the course of the evidentiary hearing shows that, despite the introduction of a directly competing product–"Dentyne Pure"–Perfetti's "Mentos Pure Fresh" chewing gum continues to experience strong retail sales.  (*See* Pls' Exs. #44, 45, 68, 75). Indeed, at the evidentiary hearing, a representative of Perfetti testified that sales of "Mentos Pure Fresh" were "on budget" for 2010.

Furthermore, the evidence before the Court fails to establish any causal connection–either positive or negative–between the sales of "Mentos Pure Fresh" and the launch of "Dentyne Pure."  To the extent that sales of "Mentos Pure Fresh" and "Mentos Pure White" may have fluctuated during the past year, there is no indication that those fluctuations are related to the existence and sale of "Dentyne Pure," rather than consumer dissatisfaction with or loss of interest in Perfetti's products, or increased competition from other brands of chewing gum.  Consequently, the Court finds that the evidence in the record fails to establish that Perfetti currently is, or will, suffer irreparable harm absent an injunction.

**C.    Harm to Others**

This factor requires the Court to (1) balance the harm Perfetti would suffer if its request for a preliminary injunction were denied against the harm Cadbury would suffer were an injunction to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties.  *Procter & Gamble Co.*, 2007 WL 2407764, at *10.  Cadbury contends that issuance of injunction would cause substantial financial and reputational harm to itself, and significant inconvenience to its customers.  Specifcally, Cadbury asserts that entry of a preliminary injunction would be financially devastating–resulting in projected damages of approximately $160 million in lost revenue, inventory, and sunk costs–and

22

would permanently damage Cadbury's reputation and destroy the "Dentyne Pure" brand entirely. (Doc. #78 at 6-7). In addition, an injunction would require retailers currently selling "Dentyne Pure" to expend time and money removing that product from their shelves and storerooms, and returning or destroying inventory.

The Court is aware that "any self-inflicted harm to Defendant that could result from issuance of preliminary injunctive relief should not excuse any improper action by the company so as to preclude an injunction." *Procter & Gamble Co.*, 2007 WL 4407764, at *10 (citing *Midwest Guar. Bank v. Guar. Bank*, 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003) (holding that a party "cannot place itself in harm's way, and then later claim that an injunction should not issue because of costs which it must incur in order to remedy its own misconduct."). However, because Perfetti has failed to establish any irreparable harm it would suffer due to the continued coexistence of "Mentos Pure Fresh" and "Dentyne Pure" that would outweigh the prospective harm to Cadbury caused by issuance of an injunction, the Court concludes that this factor weighs against injunctive relief. *See Frisch's Rest., Inc.*, 759 F.2d at 1270 ("[Plaintiff] has not shown any irreparable harm it would suffer which would 'decidedly outweigh' the prospective harm to [defendant] if the injunction were to issue.").

**D.     Public Interest**

Because the Court has found there is little likelihood of confusion, the public interest is not served by the issuance of a preliminary injunction. *Cf. Big Boy Rests. v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866, 873 (E.D. Mich. 2002) ("The policy behind protecting trademarks is to prevent the public from being misled as to the source or origin of the goods or services they are buying. . . . Thus, enjoining Defendant from using a mark confusingly similar to [Plaintiff's] mark would best serve the public interest.").

### III.  CONCLUSION

Accordingly, for the reasons stated herein, because consumers are unlikely to be confused as to the source of the parties' products, and the balance of harms weighs against the issuance of a preliminary injunction, **IT IS ORDERED** as follows:

1.    Plaintiffs' Motion for Preliminary Injunction (Doc. #9) is hereby **DENIED**; and

2.    This matter is hereby set for a **Telephonic Status Conference** on **Monday, August 30, 2010 at 11:00 a.m.**  The Court will initiate the call; however each of the parties shall contact the undersigned's Chambers on or before August 27, 2010 and advise which attorneys will be participating on that party's behalf and the telephone number at which they can be contacted for the conference.

This 18th day of August, 2010.



Signed By:

_David L. Bunning_   *DB*

United States District Judge

G:\DATA\Opinions\Covington\2-10-35-PI-MOO.wpd